1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JAMES ANDREW GUASCH,                           No. C 10-5628 WHA

                    Petitioner,

        v.

MATTHEW CATES, in his capacity as              **ORDER DENYING PETITION FOR**
Secretary of the California Department of       **WRIT OF HABEAS CORPUS**
Corrections and Rehabilitation, and TERRI
GONZALEZ, in her capacity as Warden,
California Men's Colony at San Luis Obispo,
California,

                    Respondents.
_____/

## INTRODUCTION

        This is a habeas action brought by a state prisoner under 28 U.S.C. 2254.  Petitioner

asserts six claims that he contends warrant habeas relief.  For the reasons set forth below, the

petition is **DENIED**.

## STATEMENT

        On July 27, 2007, a jury in Santa Clara County Superior Court convicted petitioner

James Andrew Guasch of solicitation to commit murder, transportation and sale of a controlled

substance, possession of a controlled substance for sale, and possession of a controlled

substance (2 CT 280–85).  The trial court sentenced him to a term of ten years and four months

in state prison, of which a 16-month consecutive term was later stayed by the California Court

of Appeal (2 CT 390).   The Court of Appeal affirmed the conviction, and the California Supreme Court denied review.  Petitioner's state habeas petition was denied by both the Court of Appeal and the Supreme Court (Exhs. 6, 10, 12, and 14).

The following facts are drawn from the decision of the California Court of Appeal on the direct appeal of the petitioner's conviction, *People v. Guasch*, No. H032720, 2010 WL 1328636 (Cal. App. Apr. 6, 2010) (Exh. 6), and are consistent with a review of the record.

Petitioner, a retired firefighter, and his wife Charlene were married for 27 years and had two children.  They owned Sequoia Cleaners, where Mrs. Guasch handled the day-to-day operations.

Mrs. Guasch testified that often when petitioner got angry at her, he would say that there was a "mine shaft in Nevada with your name on it" and that he had a "shotgun and a shell" and that she would not be missed.  Petitioner's neighbor Gale Leung also heard him make such threats.  Leung's roommate Mike Evanson heard petitioner say at least five times that one mine shaft had Mrs. Guasch's name on it.[1]

In 2004, petitioner complained to Mr. Evanson that Mrs. Guasch was cold and sexually inattentive.  Around that time, petitioner met Steve Pawlaczyk and his wife, Dana.

Mr. Pawlaczyk testified that petitioner hired him for various jobs.  The Pawlaczyks also used drugs with petitioner.  According to Mr. Pawlaczyk, petitioner sold methamphetamines and pharmaceutical drugs that he would get from a friend who collected expired drugs from pharmacies and hospitals.  Petitioner provided his girlfriend, Pamela Carmody, with drugs, and sometimes Mr. Pawlaczyk sold drugs for petitioner.

On April 9, 2006, Ms. Carmody moved into petitioner's house, and he told Mrs. Guasch to stay in the back.  Instead, she moved out.  The next day, Mr. Evanson warned Mrs. Guasch about petitioner and advised her about how to protect herself and avoid surveillance.[2]  Shortly thereafter, Mrs. Guasch filed for divorce and obtained a stay-away order against petitioner and

[1] Petitioner and his friends went on camping trips near mine shafts in the Nevada desert.

[2] In 2005, petitioner had bragged to Ms. Leung that he had a surveillance device he used to listen to cell phone calls in the area.

United States District Court
For the Northern District of California

an order freezing their assets, which petitioner had been liquidating. Mrs. Guasch also hired a body guard because petitioner's behavior had become wildly erratic, he owned several guns, and she was afraid he would kill her.

On April 18, Mrs. Guasch stayed with Leung and Evanson at their residence. She did not tell petitioner. However, the next day, he called her there and said her car needed oil. Mrs. Guasch looked out the window and saw that petitioner had moved her car and was staring at the Leung-Evanson house. Frightened, Mrs. Guasch called Mr. Evanson, and on his advice, she fled over the back fence and had a friend pick her up. Petitioner called the house again and left a message, saying that he could see her and wanted to talk.

The next day petitioner visited a friend, Valerie Smith. His behavior seemed erratic, and he admitted taking methamphetamines. Petitioner told her that he and Mrs. Guasch were separated, and he was seeing someone else. He seemed angry at Mrs. Guasch, blamed her for his problems, and repeatedly said he could "take her out." Ms. Smith responded, "Jim, you don't want to kill her. This is crazy." Petitioner just shook his head and held his breath. Later, Ms. Smith warned Mrs. Guasch about petitioner, who seemed like a different person. Mrs. Guasch agreed and said she now had a body guard. Mrs. Guasch then changed the beneficiary on her life insurance from petitioner to her children because she feared petitioner might kill her.

Mr. Pawlaczyk testified that in May 2006, petitioner repeatedly said he wanted his wife killed. Mrs. Pawlaczyk also heard petitioner say this several times. Even Ms. Carmody made comments about killing Mrs. Guasch.

In June 2006, petitioner told Edward Lynch, a cabin neighbor, that he had three fully automatic weapons. Petitioner said he was angry at Mrs. Guasch because of the divorce and told Mr. Lynch that he wanted to kill her. Mr. Lynch thought he was exaggerating and told him to relax. Petitioner became more emphatic, however, repeated his threat, and said that he had been arrested for possessing illegal weapons, which he accused Mrs. Guasch of planting.

During the divorce proceedings, petitioner told Mr. Evanson that Mrs. Guasch did not know whom she was "fucking with." Concerned about petitioner's anger and access to weapons, Mr. Evanson offered to secure them, but petitioner declined. Petitioner also told his

3

United States District Court

For the Northern District of California

1   friend, Robert Duarte, that he was being mistreated during the divorce proceedings and wanted

2   Mrs. Guasch to know that she would always have to be concerned about him and "[l]ook over

3   her shoulder."  Later, petitioner sent a letter to Mr. Duarte that was disturbing because it sought

4   to influence his testimony.

5          As the divorce proceedings progressed, petitioner told Mrs. Guasch, "Gloves are off

6   now.  You're really gonna get it."  In a declaration in family court, Mrs. Guasch stated that

7   petitioner caused her to fear for her safety.  When petitioner was ordered from the family house,

8   Mr. Evanson again offered to take his weapons, and petitioner agreed.  Mr. Evanson took 31

9   guns, which police later seized.

10         In the summer of 2006, petitioner asked David Glovin, the computer person for Sequoia

11  Cleaners, for passwords so he could check the accounting.  Mr. Glovin refused, and petitioner

12  became irate.  Mr. Glovin later detected a spyware program on Mrs. Guasch's business

13  computer and removed it.

14         In January 2007, Jennifer Scott, the Gausches' long-time mortgage broker, was in the

15  process of handling a court-ordered refinancing of the Guasch residence.  Petitioner tried to stop

16  it, and Ms. Scott became afraid because petitioner threatened her.  On January 19, 2006,

17  petitioner went to Ms. Scott's company office.  He threatened an escrow officer there and then

18  headed toward Ms. Scott's office.  She called the police, locked the door, and hid inside with

19  other employees.  Petitioner banged on the door, but the police came and stopped him.

20         In February 2007, Mr. Hanson received a court order barring him from changing any of

21  the Guasches' life insurance policies.  Mr. Hanson informed petitioner, who said he was "pissed

22  off" at Mrs. Guasch.

23         Mr. Pawlaczyk testified that in June 2007, petitioner used infrared goggles to watch

24  Mrs. Guasch and was getting more serious about making her "go away."  Mrs. Pawlaczyk

25  testified that after Mrs. Guasch filed for divorce and obtained a restraining order against

26  petitioner, petitioner said things like, "I just want her to go away."  He sounded very serious.

27  He repeatedly said that he wanted to have her killed, he talked "figures," and discussed with

28  Mr. Pawlaczyk how to go about it.  Petitioner said Mrs. Guasch was making life "miserable" for

1   him by calling the police whenever he violated the restraining order.  He said that now

2   "desperate times required desperate measures."  Petitioner told Mr. Pawlaczyk that he wanted to

3   inject Mrs. Guasch with an overdose of drugs and described how someone could get into the

4   house through the wine cellar.  Both Mr. and Mrs. Pawlaczyk testified that petitioner explained

5   how Mrs. Guasch could be dismembered and thrown down a mine shaft that he knew about a

6   mine in the desert, where she would never be found.  Petitioner offered to show Mr. Pawlaczyk

7   where the mine was located.

8        Mr. Pawlaczyk testified that one day petitioner offered him "a job for life in the event

9   that I would help him with the scheme to kill his wife."  In response, Mr. Pawlaczyk invented a

10  person named "Larry" and told petitioner that "Larry" was a parolee, who needed money and

11  was looking for work and could help petitioner with his "problem" because he was a "problem

12  solver."  The "problem" they were talking about was Mrs. Guasch.  Mr. Pawlaczyk testified that

13  petitioner offered to pay "Larry" some unspecified amount of cash and/or drugs.  Petitioner also

14  said that he could provide a gun to kill his wife.

15        On June 25, 2007, police arrested Mr. and Mrs. Pawlaczyk on charges of commercial

16  burglary and using a stolen credit card.  At that time, Mr. Pawlaczyk told the arresting officer

17  about petitioner and expressed concern for Mrs. Guasch.  The officer relayed this information to

18  the Santa Clara County Special Enforcement Team (CSET), and CSET Agents St. Clair and

19  Mecir interviewed Mr. and Mrs. Pawlaczyk.

20        During his interview, Mr. Pawlaczyk said he was talking because he did not want

21  anything to happen to Mrs. Guasch and felt that sooner or later petitioner might "get someone

22  else to do it."  He said that petitioner trusted him, and he thought that by telling petitioner that

23  he would try to help him with his "problem," he could delay things until petitioner was in jail.

24  Petitioner got more desperate, however, saying it was "coming down to the wire and that

25  something has to happen to his wife" because of what she was doing to him.  Mr. Pawlaczyk

26  said he asked what petitioner meant, and he said, "Well, she's gotta go.  She's gotta be taken

27  out of this situation [be]cause I have to do something to get rid of her.  If she testifies against

28  me, I'm gonna go to prison."  Mr. Pawlaczyk asked him again what he meant.  And petitioner

United States District Court

For the Northern District of California

1    responded, "Well, I got a hunch that — that you know. . . ."  He continued, "It's out in the

2    desert," and "I can't do anything[,] my hands are tied."

3              During the interview, Mr. Pawlaczyk also said that petitioner was paranoid and asked if

4    he was wearing a "wire."  Days before Mr. Pawlaczyk was arrested, petitioner offered to give

5    him a gun, saying, "You need it.  Let's go; let's go."  Mr. Pawlaczyk demurred, however,

6    because he did not want any trouble for himself.  He said he warned petitioner that if anything

7    happened to Mrs. Guasch, the police would go straight to petitioner and his friends.  Petitioner

8    ignored him.  He said he had no "option" and that if she were to "be on a milk carton" or

9    "disappear," he would have a better chance of "getting off" his court case and would not have

10   anything to worry about.  Mr. Pawlaczyk asked if he was just kidding or serious, and petitioner

11   said that he was serious and that "something has to happen soon."

12             When the agents asked how petitioner might get money to do something to Mrs. Guasch,

13   Mr. Pawlaczyk opined that petitioner's brother had a lot of cash.  Mr. Pawlaczyk said he asked

14   petitioner what he would offer if he were to help him, and petitioner said lifetime employment.

15   Mr. Pawlaczyk told petitioner he could not help because he had family and also prior strike

16   convictions and did not want to get involved in anything serious.  Mr. Pawlaczyk said that

17   petitioner then asked if Mr. Pawlaczyk knew anyone because he needed someone but if "[p]ush

18   comes to shove, I'm gonna have to do it myself."  Mr. Pawlaczyk said that he might know

19   someone.

20             Mr. Pawlaczyk told the agents that on the same day, petitioner said, "Man, they got me

21   on contempt of court.  I need something to happen to my wife."  Petitioner explained that he

22   was going to have to do community service, and he wanted something to happen while he was

23   gone because he would have an alibi.  Petitioner asked again if Mr. Pawlaczyk knew anyone,

24   and Mr. Pawlaczyk said he knew a bank robber named "Larry," who was on parole and looking

25   for work.  Petitioner said he would be willing to meet the man anytime and pushed Mr.

26   Pawlaczyk to set up a meeting.  Mr. Pawlaczyk said he did not know what type of person

27   petitioner expected to do "that kind of a job," but this man was very serious and did not "play

28   around."  He asked petitioner what he was willing to pay, and petitioner said he had already

United States District Court

For the Northern District of California

1   started putting cash aside.  Petitioner asked Mr. Pawlaczyk to see what "Larry" would be

2   willing to take.  Mr. Pawlaczyk opined that he thought it would be between $20,000 and

3   $50,000 but that "Larry" would probably not demand it all "up front."  Petitioner said he could

4   probably get a gun if Larry needed it.

5          During the interview, Mr. Pawlaczyk agreed to make a recorded call to petitioner.

6   During the call, he told petitioner that if he wanted to meet "Larry," he had to do so by himself

7   because Mrs. Pawlaczyk had just been arrested, and he needed to attend to family business.  Mr.

8   Pawlaczyk gave petitioner a phone number, which was the CSET cell phone number.

9          On June 27, 2007, Agent St. Clair called petitioner, identified himself as Mr.

10  Pawlaczyk's friend, and discussed a meeting.  Agent St. Clair said they "need to get this done

11  sooner," but petitioner said they still had time.  Petitioner agreed to bring a picture of Mrs.

12  Guasch.  The two men met at the Spoons Restaurant in Campbell along with another agent.

13  Petitioner put photographs of Mrs. Guasch on the table.  Petitioner said that she had

14  bodyguards.  Petitioner did not know where she was living but suggested they call Sequoia

15  Cleaners to find out when she would be there.  Petitioner described the vehicles she might be

16  driving.  At times, petitioner seemed comfortable and at other times, nervous and sweaty.  He

17  discussed his divorce and said he was "between a rock and a hard place."  The three agreed to

18  keep the meeting secret because someone might later talk after Mrs. Guasch was killed.

19  Petitioner mentioned the Godfather movie and believed "you don't talk."  He acknowledged

20  that some people snitch, which he found "scary."

21         Agent St. Clair opined that it would be better if petitioner was in custody when "the

22  bomb dropped."  Petitioner indicated that he thought Mrs. Guasch might try to kill him and was

23  worried about "getting busted."  He said, however, "I gotta do what I gotta do to defend

24  myself."  When Agent St. Clair mentioned the use of a mine shaft, petitioner said that there

25  were "many, many places."

26         Petitioner told the agents that once he regained control of Sequoia Cleaners, he would

27  have jobs for everyone.  Petitioner indicated that he sold drugs and could supply them.  When

28  Agent St. Clair indicated that he wanted a retainer for his services, petitioner gave him a bottle

United States District Court

For the Northern District of California

1    of oxycodone worth $4,000.  Petitioner further indicated that more was available.  Agent St.

2    Clair asked for an addition retainer of $1,000.  Petitioner agreed and said he would call later,

3    but he never did.

4          On June 28, 2007, police officers arrested petitioner and seized his keys and cell phone.

5    During a search of petitioner's house, police found, among other things, a large number of

6    controlled substances, including methamphetamines, Demerol, oxycodone pills and solution,

7    steroids, percocet, haloperidol, valium, cocaine, testosterone gel, and Pentothal, some in

8    amounts indicating possession for sale.  They also found prescription drug stickers and glass

9    pipes.  Police seized the jacket petitioner had worn to the meeting and found the photographs of

10   Mrs. Guasch in a pocket.  Police seized various pieces of electronic equipment, videotape

11   recordings of Mrs. Guasch walking in front of the house, a loaded ammunition clip, and a

12   digital scale.

13         At the time of trial, Mr. Pawlaczyk was in custody.  He testified that he was currently

14   facing two counts of commercial burglary, for entering a liquor store and a Safeway store with

15   the intent to steal; and one count of unlawfully obtaining the credit card number of another

16   person.  He admitted that he used to use heroin, methamphetamines, and oxycontin but said he

17   had been clean since entering a methadone program in December 2006.

18         Mr. Pawlaczyk admitted having several prior felony convictions.  In 1995, he was

19   convicted of residential burglary.  Later, he was charged with six counts of first-degree burglary

20   and pled guilty to three counts.  As a result, he received a nine-year prison term and was

21   released on parole in 2003.  Mr. Pawlaczyk also admitted that he was returned to prison for

22   parole violations, one for possession of heroin.  Mr. Pawlaczyk explained that his prior

23   convictions rendered him potentially subject to a three-strike sentence of 25 years to life for any

24   subsequent felony conviction.  He said he hoped, however, that when the authorities reviewed

25   the current case against him, they would consider his prior strike offenses old and dismiss them

26   in the interests of justice.  He noted that a year before, he had been arrested for possession of

27   heroin, and when the case was reviewed, the authorities declined to prosecute the matter as a

28   felony.  Rather, the arrest resulted in a parole violation and his return to prison.

United States District Court

For the Northern District of California

Mr. Pawlaczyk said that he participated in petitioner's investigation and the prosecution because of his concern for Mrs. Guasch and also because he hoped for leniency in the pending case against him.  According to Mr. Pawlaczyk, the agents who interviewed him said they would "go to bat" for him as much as they could and request leniency from the District Attorney.  Later his parents told him that they had spoken to Special Agent Mecir and thought that he had requested leniency.  Mr. Pawlaczyk testified that although he hoped for leniency, he was never promised anything in exchange for his testimony against petitioner.  He also said that no one ever told him that he did not have to worry about the pending charges.  Nevertheless, Mr. Pawlaczyk believed that Agent Mecir had requested leniency on his behalf.[3]

Mr. Pawlaczyk testified that ultimately the prosecution offered him a 32-month plea bargain, which he understood to mean that all but one of his strikes would be dismissed.  At the time he testified, however, he had not as yet decided whether to accept the offer and remained in custody with no scheduled release date.

Mrs. Pawlaczyk testified that she had three prior convictions for computer vandalism, cultivation of marijuana, and commercial burglary and had recently pled guilty to using a stolen credit card, burglary, and false personation.  At the time of trial, she was in custody at a regimented correctional program serving a 10-month term.  She denied that she had ever been offered or promised leniency in the cases against her and Mr. Pawlaczyk in exchange for her testimony against petitioner.  She was unaware of any promises that might have been made to Mr. Pawlaczyk.

For the defense, doctor Matthew Stubblefield, a psychiatrist, testified as an expert on Attention Deficit Disorder.  He said that petitioner had been his patient for eight years and suffered from ADD with hyperactivity and impulsivity; bipolar disorder; and substance abuse, mainly use of methamphetamines.  He also suspected that petitioner had a learning disorder.  He

---

[3] Special Agent Mecir testified that after June 2007, he did not communicate or have any contact with the district attorney's office for the purpose of requesting leniency for either Mr. or Mrs. Pawlaczyk.  He did not intervene in any way on behalf of either concerning the disposition of the cases against them.  Rather, he testified that he simply informed the prosecutor handling petitioner's case that Mr. Pawlaczyk was cooperating and had agreed to testify against petitioner.

United States District Court

For the Northern District of California

said that violent tendencies are not considered part of the symptomlogy.  Those who had ADD with impulsivity and hyperactivity factors, such as petitioner, tend to say and do things impulsively without thinking them through.  They will blurt out intense, passionate, or exaggerated feelings without inhibitions or regard for how they will be taken and not necessarily meaning what they say.  He noted that petitioner tended to do this and once said that he would rather burn down the building where his business is located than give it to his wife.  Doctor Stubblefield did not report this nor did he consider it a red flag because he did not think petitioner meant it, and petitioner did not say he was intending to burn it down.  He said that petitioner made many exaggerated statements reflecting fantasies that he did not follow through on.

Doctor Stubblefield said he would be surprised to hear that petitioner had made comments to an undercover officer about wanting to kill his wife.  He said that although petitioner at times appeared unkempt, he was generally lucid, cooperative, and pleasant; he was a little restless but had good eye contact and normal speech.  Sometimes he was depressed; other times hypomanic.  He never exhibited psychotic processes.  Doctor Stubblefield knew that petitioner used methamphetamines.  He said that many people with ADD attempt to self-medicate with drugs.  He further explained that a person taking methamphetamines would appear racy, restless, agitated, impulsive, and disconnected.  Consequently, a person with ADD who is not getting treatment can appear to be on methamphetamines.

Attorney Garrick Lew, Pamela Carmody's attorney, testified that during petitioner's trial, he was consulting with Ms. Carmody and overheard Mr. Pawlaczyk yelling to his wife.  Among other things, Mr. Pawlaczyk shouted: "I'll be home October 1st.  I'll be out next week."  "You'll be out too.  We'll both be out."  "Hang in there, babe."  "Did you get the money?"  "We're set up.  They're giving us a place to stay and food."  "You have to testify.  You can do it, honey."  "We're going to be here all day."  "I'll see if I can get moved nearer to you."  "I'm walking."  "It's all good.  Jim's here.  Pam's hear.  It's all good."

A jury convicted petitioner of solicitation to commit murder; two counts of transportation and sale of oxycodone, a controlled substance; possession of oxycodone for sale;

10

1   possession of "injectibles-meperdine," a controlled substance, for sale; and possession of

2   methamphetamine.  CAL. PENAL CODE § 653f(b); CAL. HEALTH & SAFETY CODE §§ 11351,

3   11352(a), 11377(a).  Petitioner admitted an enhancement allegation that he was out of custody

4   on bail in another felony case when he committed the offenses.  CAL. PENAL CODE § 12022.1;

5   (2 CT 280–85; 3 RT 132).  The Superior Court judge imposed a term of six years for

6   solicitation; consecutive 16-month terms for both oxycodone counts; a consecutive one-year

7   term for possession of oxycodone for sale; a consecutive eight-month term for possession of

8   methamphetamine; and a concurrent three-year term for possession of "injectibles-meperdine."

9   The court also imposed a two-year term for the enhancement but stayed its execution.  One of

10  the 16-month terms was stayed on appeal, so defendant should now be serving a nine-year term

11  of imprisonment in state custody.

## ANALYSIS

13      Petitioner brings six claims for habeas relief.  He contends that he was denied the

14  following rights: (1) his right to confront and cross-examine witnesses due to the trial court's

15  prohibition of certain cross-examination of a prosecution witness; (2) his right to due process of

16  law due to the prosecution's failure to produce the terms of an alleged plea bargain with an

17  informant; (3) his right to effective assistance of counsel due to his trial counsel's failure to

18  make certain objections; (4) his right to a fair trial due to the introduction of "propensity for

19  violence" evidence; (5) his right to due process due to prosecutorial misconduct via alleged

20  propensity arguments in closing; and (6) his right to a trial free of constitutional violations due

21  to cumulative errors.  None of these claims is persuasive.

### A.   STANDARD OF REVIEW

23      A district court may not grant a petition challenging a state conviction or sentence on the

24  basis of a claim that was reviewed on the merits in state court unless the state court's

25  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

26  unreasonable application of, clearly established Federal law, as determined by the Supreme

27  Court of the United States; or (2) resulted in a decision that was based on an unreasonable

28  determination of the facts in light of the evidence presented in the State court proceeding."  28

11

U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is an "unreasonable application of" Supreme Court authority, such that it falls under the second clause of Section 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Williams (Terry)*, 529 U.S. at 413.  A writ may not issue "simply because [the] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340.  A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Bragg v. Galaza*, 242 F.3d 1082, 1087, *amended*, 253 F.3d 1150 (9th Cir. 2001).  Under Section 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).  The California Court of Appeal considered and decided petitioner's state habeas petition concurrent to his direct appeal to that same court, and denied the petition without comment while issuing a detailed opinion on the direct appeal. *Guasch*, 2010 WL 1328636 (Exhs. 6 and 10).  The California Supreme Court denied review of both the direct appeal and the habeas petition without comment (Exhs. 12 and 14).  The decision of the Court of Appeal is thus the last reasoned decision of the state court.  Each of petitioner's arguments will be addressed in turn.

**United States District Court**

For the Northern District of California

**B.     NO CONFRONTATION CLAUSE VIOLATION**

As his first claim, petitioner argues that he was denied his Sixth Amendment right to confront and cross-examine Mr. Pawlaczyk about the details of his pending criminal case.  In other words, although the defense *did* cross-examine Mr. Pawlaczyk, petitioner claims his Sixth Amendment rights were violated because the trial court restricted his cross-examination of Mr. Pawlaczyk specifically about the conduct underlying the charges that were pending against Mr. Pawlaczyk at the time of petitioner's trial.

On direct appeal in state court, petitioner claimed that there had been a Confrontation Clause violation in two ways, in that cross-examination of Mr. Pawlaczyk regarding the charges pending against him was relevant to impeachment of both Mr. Pawlaczyk's statements in the taped interview with police about petitioner and also his statements during direct testimony preceding cross-examination.  As to both (the taped-interview statements and the direct-examination testimony) and based on the same analysis, the Court of Appeal held that there had been no Confrontation Clause violation:

> The Sixth Amendment guarantees the right of cross-examination, that is, "'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'[]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679, 106 S.Ct. 1431, 89 L.Ed.2d 674, quoting *Delaware v. Fensterer* (1985) 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15, italics in *Fensterer*.)  Under the Sixth Amendment, trial courts retain wide latitude to reasonably restrict the nature and subject matter of cross-examination based on concerns about harassment, prejudice, confusion of the issues, repetitiveness, and marginal relevance.  (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 679; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1051, 90 Cal.Rptr.2d 607, 988 P.2d 531.)  Indeed, "[a]s a general proposition, the ordinary rules of evidence do not infringe on a defendant's right to present a defense. [] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.'"  (*People v. Frye* (1998) 18 Cal.4th 894, 945, 77 Cal.Rptr.2d 25, 959 P.2d 183, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834, 226 Cal.Rptr. 112, 718 P.2d 99; *Frye* disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, 87 Cal.Rptr.3d 209, 198 P.3d 11.)
>
> It is settled that the exclusion of impeachment evidence under section 352 does not violate the right of cross-examination unless a reasonable jury might have received a "significantly different impression" of the witness's credibility had the excluded cross-examination been permitted.  (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680; *People v. Quartermain* (1997) 16 Cal.4th 600, 623-624, 66 Cal.Rptr.2d 609, 941 P.2d 788.)
>
> In our view, a similar analysis applies here.  The trial court implicitly recognized that it could not force Mr. Pawlaczyk to waive his privilege against

13

United States District Court

For the Northern District of California

self-incrimination.  (See Evid.Code, § 404 [court may not compel answer that would incriminate witness]; e.g., *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1555, 84 Cal.Rptr.2d 655 [court may limit examination to avoid invocation of rights by witness].)  Moreover, the court also found that asking Mr. Pawlaczyk about the as yet unadjudicated facts of pending charges would set the stage for a trial-within-a-trial and unnecessarily consume time and resources.  Therefore, under Evidence Code section 352, the court precluded further inquiry concerning those facts.

It is true, however, that the invocation of rights by Mr. Pawlaczyk and the court's limitation on cross-examination prevented defendant from eliciting testimony related to parts of the taped interview that might have had impeachment value.  Under the circumstances, we believe that defendant's Sixth Amendment claim turns on whether a reasonable jury might have received a "significantly different impression" of the witness's credibility had the excluded cross-examination been permitted. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680.)  We think not.

The jury heard a substantial amount of evidence relevant to Mr. Pawlaczyk's credibility.  In particular, jurors learned that Mr. Pawlaczyk had numerous prior felony convictions for burglary.  They learned he had served a prison term, been released on parole, and been reincarcerated for possession of heroin.  They learned that his prior convictions made him vulnerable to long prison term in any future felony prosecution.  They learned that he had recently been arrested for two burglaries and possession of a stolen credit card, he thought the agents would request leniency, and he hoped his cooperation would help him get lenient treatment in his case.  Moreover, jurors heard defense counsel cross-examine Mr. Pawlaczyk about what he said in his taped statement.

Given this substantial amount of impeachment evidence, we do not find that the additional testimony counsel sought to elicit would have added anything of significance to the jury's impression of Mr. Pawlaczyk's credibility.  The examination would have involved facts that were wholly unrelated to defendant's alleged conduct and his guilt or innocence.  None of the proposed testimony would, or could, have directly contradicted Mr. Pawlaczyk's testimony about the things defendant said to him.  And the proposed testimony would have involved facts and circumstances that were disputed.  In other words, the impeachment benefit defense counsel sought would not be apparent to the jury on the face of the testimony counsel sought to elicit.

In sum, therefore, we conclude that defendant's inability to cross-examine Mr. Pawlaczyk about statements in the taped interview related to collateral matters and did not render the admission of the entire interview or even those statements a violation of his Sixth Amendment rights.  Rather, for all practical and meaningful purposes, Mr. Pawlaczyk was available for cross-examination.

*Guasch*, 2010 WL 1328636, at *12–15 (Exh. 6 at 19–25).  Although the Court of Appeal said

even more on the matter, this passage allows the reader to appreciate the thorough analysis and

consideration given to this matter by the state court.

The state court considered petitioner's Confrontation Clause claim under the proper

clearly-established federal law recounted above.  In his traverse, petitioner discusses the very

14

United States District Court

For the Northern District of California

1    same decisions reviewed and applied by the state court.  In the context of this habeas petition

2    brought under Section 2254, this order must only consider whether the state court's decision

3    involved an unreasonable application of that law or resulted in a decision that was based on an

4    unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. 2254(d).

5    This order finds that the state court's application of law was a reasonable application of law and

6    was based on a reasonable determination of the facts presented there.

7         During Mr. Pawlaczyk's testimony during the trial, his tape-recorded police interview

8    was played for the jury (7 RT 422).  In that interview, Mr. Pawlaczyk stated that he "did not do

9    anything" and was simply with his wife when she tried to use the stolen credit card (1 CT 191,

10   198, 200).  During cross-examination, defense counsel asked whether Mr. Pawlaczyk and his

11   wife had gone into a Safeway and liquor store with a stolen credit card.  Mr. Pawlaczyk asserted

12   his Fifth Amendment privilege and the trial court instructed defense counsel not to ask

13   questions likely to result in the witness invoking this privilege (7 RT 443–44).  Outside the

14   jury's presence, defense counsel stated that he wanted to explore the facts of the pending

15   charges to impeach Mr. Pawlaczyk and moved to strike Mr. Pawlaczyk's testimony, claiming

16   that because Mr. Pawlaczyk had invoked his Fifth Amendment privilege, petitioner's right to

17   cross-examination had been impaired (7 RT 446–48).  The trial court prohibited defense

18   counsel from questioning Mr. Pawlaczyk about the facts of his pending credit-card case and

19   denied the motion (7 RT 448–52).  Defense counsel nevertheless cross-examined Mr.

20   Pawlaczyk about other matters (*see generally* 7 RT 430–77, 483–87).

21        Thus, Mr. Pawlaczyk was amply available for cross-examination at petitioner's trial.  To

22   the extent that defense counsel was prevented from eliciting impeaching material concerning

23   the unrelated charges pending against Mr. Pawlaczyk because Mr. Pawlaczyk invoked his right

24   against self-incrimination, it was reasonable for the state court to determine that a reasonable

25   jury would not have received a "significantly different impression" of Mr. Pawlaczyk's

26   credibility had the excluded cross-examination been permitted.  As reviewed by the state court,

27   a significant amount of impeaching evidence was otherwise introduced so that the jury could

28   fully assess his credibility, biases, and motives (*see* 7 RT 420–22, 430–31, 438–40, 442–43,

United States District Court

For the Northern District of California

469–77, 483–84, 488–89).  The precluded cross-examination would not have contradicted Mr. Pawlaczyk's testimony about the things that petitioner had said to him regarding wanting to kill his wife (*see, e.g.*, 7 RT 427).  Petitioner fails to even address in rebuttal in his traverse the primary holding of the state court that relief was precluded because the jury would not have received a significantly different impression of Mr. Pawlaczyk if the sought cross-examination had been allowed.[4]

We must remember that Pawlaczyk had not yet been convicted on the credit-card charge.  It was a mere collateral act, a bad one if true, but nonetheless collateral.  And, it had not yet been proven.  To have allowed a trial within a trial, that is, a trial of a witness's unrelated and as-yet unproven credit-card wrong within petitioner's own trial for trying to kill his wife would have been unwise.  Defense efforts like this are routinely and rightly rejected without doing any damage to the Sixth Amendment.

For these reasons, petitioner is not entitled to relief based on his Confrontation Clause claim because the state court considered this claim under the proper clearly-established federal law, and its application of this law was reasonable and was based on a reasonable determination of the facts presented.

**C.     NO *BRADY* VIOLATION**

As his second claim, petitioner argues that he was denied due process of law under the Fourteenth Amendment and *Brady v. Maryland*, 373 U.S. 83 (1963), due to the prosecution's failure to produce the terms of an allegedly more favorable plea agreement between the State and Mr. Pawlaczyk, as opposed to the allegedly less favorable pending plea agreement about which Mr. Pawlaczyk testified.

---

[4] Although petitioner does argue in conclusory terms that the alleged error was prejudicial, because "[h]ad the jury been told the truth [about Pawlaczyk's pending charges], there would have been no conviction on [the solicitation] charge" (Traverse 10), he fails to analyze any of the other inculpatory evidence which tends to show that any alleged Confrontation Clause violation was harmless error given the other evidence of petitioner's guilt.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  Regardless, the relevant state court decision was that the jury would not have had a significantly different impression of Mr. Pawlaczyk's credibility — and that is the decision that petitioner declines to address but which this order finds reasonable pursuant to Section 2254(d).

United States District Court

For the Northern District of California

1       On petitioner's direct appeal in state court, the Court of Appeal held that there had been

2  no *Brady* violation:

3           Defendant notes that Mr. Pawlaczyk thought that police had made a
   request for leniency to the district attorney in his case.  He notes that Mr.
4  Pawlaczyk was offered a 32-month plea bargain.  And he notes that Mr.
   Pawlaczyk was overheard making statements to his wife to the effect that they
5  were going to get out and be given food and a place to stay.  Defendant claims
   that taken together, this information suggests that Mr. Pawlaczyk had an
6  agreement with the prosecution for favorable treatment in exchange for his
   testimony.  He argues that prosecution's failure to disclose the request for
7  leniency and agreement violated *Brady* and his right to due process.

8           The record reveals that after speaking with his parents, Mr. Pawlaczyk
   understood that Agent Mecir had requested leniency in his case.  However, Agent
9  Mecir testified that he did not request leniency for Mr. Pawlaczyk or
   communicate with anyone in the district attorney's office for that purpose.
10 Rather, he simply informed the prosecutor in defendant's case that Mr. Pawlaczyk
   was cooperating and had agreed to testify.

11
            Moreover, Mr. Pawlaczyk testified that no one from the district attorney's
12 office had offered him any deal in exchange for his testimony against defendant.
   He also did not know whether the so called "three strikes committee" ever
13 received a request for leniency on his behalf.  Similarly, Mrs. Pawlaczyk testified
   that she was not promised anything in exchange for her testimony and was
14 unaware of any promises or request for leniency on Mr. Pawlaczyk's behalf.

15          Under the circumstances, defendant cannot establish the factual premise of
   his claim — i.e., that there was, in fact, a request for leniency or deal for Mr.
16 Pawlaczyk's testimony that the prosecutor failed to disclose.

17 *Guasch*, 2010 WL 1328636, at *17 (Exh. 6 at 28–29).  The Court of Appeal also noted in a

18 footnote immediately after this passage that petitioner "reasserts this claim in his petition for

19 habeas corpus based on additional evidence outside the record on appeal."  The state habeas

20 petition was denied (Exh. 10).

21     The Supreme Court has held "that the suppression by the prosecution of evidence

22 favorable to an accused upon request violates due process where the evidence is material either

23 to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*

24 *v. Maryland*, 373 U.S. 83, 87 (1963).  The three components of a *Brady* violation are: (i) the

25 evidence at issue must be favorable to the accused, either because it is exculpatory, or because it

26 is impeaching; (ii) that evidence must have been suppressed, either willfully or inadvertently;

27 and (iii) prejudice must have ensued.  *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  "The

28 evidence is material only if there is a reasonable probability that, had the evidence been

17

United States District Court

For the Northern District of California

1   disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable

2   probability' is a probability sufficient to undermine confidence in the outcome."  *United States*

3   *v. Bagley*, 473 U.S. 667, 682 (1985).  In the context of this habeas petition brought under

4   Section 2254, where the state court considered petitioner's *Brady* claim under the proper

5   clearly-established federal law, this order must only consider whether the state court's decision

6   involved an unreasonable application of that law or resulted in a decision that was based on an

7   unreasonable determination of the facts in light of the evidence presented there.  28 U.S.C.

8   2254(d).

9       During petitioner's trial, Mr. Pawlaczyk testified (i) that he had been told that the Three

10  Strikes Committee had reviewed his pending case and decided to dismiss three of his four prior

11  strike convictions because of their age, resulting in an offer of 32 months which he had

12  considered; (ii) that he thought Agent Mecir had planned to make, or had already made, a

13  request for leniency in his pending case, but there had been "no word on that" and he did not

14  actually know whether a request for leniency had been made; (iii) that no one from the District

15  Attorney's Office had offered him any deal in exchange for his testimony against petitioner;

16  (iv) and that when he was arrested, "no offers or no deals were offered by any officer" (7 RT

17  470–71, 473–74, 477–78, 483–84, 489).

18      Agent Mecir testified that he had not contacted anyone at the District Attorney's Office

19  to request leniency in Mr. Pawlaczyk's case, but that he had told the prosecutor handling

20  petitioner's case that Mr. Pawlaczyk was cooperating (10 RT 1350–52).  Agent Moiseff

21  testified that he had checked on Mr. Pawlaczyk's status and that at that time Mr. Pawlaczyk was

22  still in custody without a scheduled release date (10 RT 1398).  Mrs. Pawlaczyk testified that no

23  promise of leniency had been given to her and that she was unaware of any promise for leniency

24  in her husband's case (7 RT 500).

25      Mr. Pawlaczyk testified in petitioner's trial in September 2007 and was sentenced

26  himself in December 2007.  Mr. Pawlaczyk told his sentencing court that no one had made any

27  promises to him about sentencing other than what had been discussed on the record.  He was

28

sentenced as a no-strike offender and placed on probation for two years (Exh. 7, Exh. A; Exh. 8, Exh. 1).

      This order finds that the state court's decision denying petitioner's *Brady* claim did not involve an unreasonable application of clearly-established law or result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. It was not unreasonable for the state court to find that there was no request for leniency or a deal for Mr. Pawlaczyk's testimony which the prosecutor had failed to disclose to the defense. As reviewed above, although Mr. Pawlaczyk initially testified that he had believed that Agent Mecir had requested leniency in his case, but that he did not know whether one had actually been made, additional evidence showed that in fact one was not made.

      In his traverse, petitioner only argues in conclusory terms that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented there. Petitioner does not rebut any of the specific facts that the state court reviewed in determining that there was no request for leniency or second plea agreement in play during petitioner's trial. Although petitioner cites Exhibit 1 to Exhibit 8 of the administrative record — the transcript of Pawlaczyk's sentencing hearing — as part of the "records of the state trial court that conclusively showed the existence of the plea deal" (Traverse 10), such transcript in *no way* shows the existence of such plea deal.[5] Given the record reviewed here, the state court very reasonably found that there was not a request for leniency or deal for Mr. Pawlaczyk's testimony that the prosecutor failed to disclose and therefore no *Brady* violation occurred.

     **D.**    **NO INEFFECTIVE ASSISTANCE OF COUNSEL**

      As his third claim, petitioner argues that he was denied effective assistance of counsel due to his trial counsel's failure to make three objections, namely that counsel failed to object

---

[5] In addition, although petitioner argues in conclusory terms that the alleged error was prejudicial (Traverse 11), he fails to analyze any of the other inculpatory evidence which tends to show that, even if there had been a request for leniency that had gone undisclosed to the defense, the result of the proceeding would not have been different, given the other evidence of petitioner's guilt and the amount of material that was already introduced to impeach Mr. Pawlaczyk. Regardless, the relevant state court decision was that there was no request for leniency or a deal for Mr. Pawlaczyk's testimony which the prosecutor had failed to disclose to the defense — and that is the decision this order finds reasonable pursuant to Section 2254(d).

United States District Court

For the Northern District of California

to: (1) the admission of the tape-recorded police interviews of Mr. and Mrs. Pawlaczyk; (2) Ms. Scott's testimony regarding petitioner's conduct at her office; and (3) the prosecutor's argument about Scott's testimony and its purpose.

Petitioner raised his ineffective assistance claim on direct appeal and in a concurrently-filed state habeas petition.  In its written opinion, the Court of Appeal reviewed the legal standard for claims of ineffective assistance of counsel, and then stated: "As noted, defendant also filed a petition for a writ of habeas in which he raises these claims of ineffective assistance. Accordingly, we reject them on appeal and address them in ruling on the petition." *Guasch*, 2010 WL 1328636, at *11–12 (Exh. 6 at 18–19).  On the same day, the Court of Appeal denied the petition in a summary order (Exh. 10).

In general, to establish that counsel provided ineffective assistance, defendants must show that: (1) counsel's performance was deficient under the standards of reasonable lawyering, *i.e.*, it "fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).  "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

In the context of a state habeas petition, the issue is whether the state court's adjudication of an ineffective assistance claim involved an "unreasonable application" of the *Strickland* standard.  "[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002) (citation omitted); *see also Harrington v. Richter*, 131 S.Ct. 770, 785–86 (2011).  Thus, federal habeas review of a state court's denial of an ineffective assistance claim is "doubly deferential." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (2009) (citation omitted).  If the state court's rejection of either prong of the two-part *Strickland* test is reasonable, then habeas relief is unavailable.  *See Brodit v. Cambra*, 350 F.3d 985, 992 (9th Cir. 2003).

United States District Court

For the Northern District of California

1

### 1.    Pawlaczyks' Tape-Recorded Police Interviews

Petitioner argues that his trial counsel was constitutionally ineffective for failing to object on hearsay grounds to the admission of the tape-recorded police interviews of Mr. and Mrs. Pawlaczyk.

During petitioner's trial, the tape-recorded statements of Mr. and Mrs. Pawlaczyk, made during their police interviews, were played for the jury, and these statements incriminated petitioner (7 RT 422, 498; 1 CT 156–201).

Petitioner has failed to show that the state court unreasonably applied the *Strickland* standard in denying petitioner's state habeas petition.  As to the performance of petitioner's trial counsel, it was not unreasonable to find it constitutionally sufficient for counsel to have made a tactical decision to allow the tape-recorded statements to be admitted without objection.  *First*, the tape-recorded statements helped defense counsel to show that the Pawlaczyks had a motive to lie, because they revealed that the police had indicated to both Mr. and Mrs. Pawlaczyk that they might be able to help in the Pawlaczyks' pending cases if they told the police what they knew about petitioner's plan to kill his wife (1 CT 157, 173, 187, 200).

*Second*, the tape-recorded statements helped defense counsel's attempt to impeach the Pawlaczyks in other ways.  The tapes revealed that Mr. Pawlaczyk had prior convictions, was subject to the Three Strikes Law, was facing a million dollar bail for his current offenses, had been on parole, was a drug user, and had "meth connections" (1 CT 178, 185–86, 192, 196).  Mr. Pawlaczyk also admitted on the tapes that he had offered to introduce petitioner to a parolee named Larry to kill his wife in exchange for petitioner's lifetime-job offer, which, albeit incriminating of petitioner, was also impeaching of Pawlaczyk (1 CT 181–82).  Mrs. Pawlaczyk admitted that she was on probation and "smoked dope" (1 CT 162, 167).

Defense counsel highlighted these incriminating facts in arguing to the jury that Mr. Pawlaczyk was "completely incredible and should not be believed for any purpose whatsoever" (12 RT 1505–08).  Petitioner's traverse fails to address in more than conclusory terms any of these legitimate reasons that his trial counsel could have chosen to not object to the admission of the recordings.  Based on the foregoing, it was not unreasonable for the state court to have

United States District Court

For the Northern District of California

1   found it constitutionally sufficient for counsel to have made a tactical decision to allow the

2   tape-recorded statements to be admitted without objection.

3       Moreover, it was not unreasonable for the state court to have found a lack of prejudice if

4   trial counsel's performance was deficient.  There was much other incriminating evidence to

5   show petitioner's guilt, even if the tape-recorded statements of the Pawlaczyks had been

6   excluded (*see, e.g.*, 4 RT 170–72, 177, 179; 5 RT 195, 205, 226–27, 243–44, 260–62, 331–32; 6

7   RT 367–69, 383, 387, 406–10, 412; 7 RT 422, 425, 427–29, 477, 481, 503–06, 517–18, 524–26;

8   9 RT 1205–36; 10 RT 1349; 2 CT 210–68).

9       Petitioner has not shown the state court's decision to have been an unreasonable

10  application of the *Strickland* standard based on trial counsel's failure to object to the

11  introduction of the tape-recorded statements.

12              **2.     Scott's Testimony**

13      Petitioner next argues that his trial counsel was constitutionally ineffective for failing to

14  object to Scott's testimony regarding petitioner's conduct at her office as improper character

15  testimony in the prosecution's case-in-chief.

16      During petitioner's trial, the prosecutor argued to the jury that petitioner had multiple

17  motives to kill his wife, including that he and Mrs. Guasch were involved in a contentious

18  divorce (11 RT 1449).  During the trial, Ms. Scott, the Guasches' long-time mortgage broker,

19  testified that she had handled a court-ordered refinance during the Guasches' divorce

20  proceedings.  On January 19, 2006, petitioner came to Scott's company office, threatened an

21  escrow officer, and then headed to Scott's office.  After the escrow officer warned Scott that

22  petitioner was heading her way, Scott became afraid, called the police, locked the office door,

23  and hid inside with other employees.  When petitioner arrived at Scott's office, he banged on

24  the door.  He then returned to his van and the police intercepted him (6 RT 353–54, 347–49,

25  356–57, 359–60, 363).

26      Petitioner has failed to show that the state court unreasonably applied the *Strickland*

27  standard in denying petitioner's state habeas petition.  As to the performance of petitioner's trial

28  counsel, it was not unreasonable to find it constitutionally sufficient for counsel to have allowed

United States District Court

For the Northern District of California

1    the Scott testimony to be admitted without objection, because any such objection would very

2    likely have been overruled by the trial court.  The Scott testimony was admissible uncharged

3    conduct evidence to prove petitioner's motive for soliciting his wife's murder.  This evidence

4    showed that petitioner was extremely angry with his wife based, in part, on how the divorce was

5    proceeding in a manner unfavorable to him.  Petitioner's traverse fails to address in more than

6    conclusory terms that his trial counsel could have chosen to not object to Scott's testimony

7    because such evidence was admissible to prove petitioner's motive to solicit.

8         "[T]he failure to take a futile action can never be deficient performance."  *Rupe v.*

9    *Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Therefore, it was not unreasonable for the state

10   court to have found it constitutionally sufficient for counsel to have made a tactical decision to

11   allow Scott's testimony without objection.  Moreover, it was not unreasonable for the state

12   court to have found a lack of prejudice if trial counsel's performance was deficient.  Other

13   evidence showed that petitioner had a motive to kill his wife due to their divorce, for money,

14   and because he had a new girlfriend (5 RT 193–95, 246, 248, 322, 325; 6 RT 376–77, 379, 392,

15   397).  And, as reviewed above, there was much other incriminating evidence to show

16   petitioner's guilt, even if Scott's testimony had been excluded.  Petitioner has not shown the

17   state court's decision to have been an unreasonable application of the *Strickland* standard based

18   on trial counsel's failure to object to Scott's testimony.

### 3.    Prosecutor's Closing Regarding Scott Testimony

20        Petitioner next argues that his trial counsel was constitutionally ineffective for failing to

21   object to the prosecutor's "propensity" argument about Scott's testimony in closing.

22        During petitioner's trial, the defense introduced the testimony of Dr. Stubblefield, an

23   expert in Attention Deficit Disorder.  Dr. Stubblefield testified that petitioner suffered from

24   ADD (predominately a hyperactive, impulsive subtype) (10 RT 1365).  He stated that petitioner

25   sometimes made exaggerated statements or blurted out statements in the heat of the moment

26   which he did not mean.  When petitioner's counsel specifically asked Dr. Stubblefield, "And

27   included in the syptomatology for this Attention Deficit Hyperactivity Disorder, is there —

28   included in that, are there violent tendencies?," Dr. Stubblefield responded, "no."  The doctor

United States District Court

For the Northern District of California

testified that he was accustomed to petitioner "making comments of passion" and other exaggerated statements, but the doctor did not think that petitioner was "capable of that kind of an act," nor that petitioner meant what he said or intended to follow through with his statement (10 RT 1369–70, 1372–73, 1382).

During closing argument, the prosecutor stated in part:

> Remember we put on Ms. Scott . . . Ms. Scott was a long time financial planner for both Charlene and Jim [the Guasches]. I put her on for one of the most significant pieces of evidence that I thought came before you, especially in light of Dr. Stubblefield's testimony, that this defendant has a propensity to engage — to be violent when he had — when he came to her shop and was banging on the door.

> If you recall the interchange between counsel and the witness, were any words stated? No. No. Direct opposite of what Dr. Stubblefield's telling you about this guy being ADD, ADHD; this individual was showing his propensity to do violence. In fact, it was that very propensity that caused Ms. Scott to call the police, lock down the doors, get in the back, and get away from this guy because she was fearful of [sic] her life and the life of her employees, knowing that this defendant was capable of doing such an act.

> She told you how much she fears him. She told you that when this is all said and done, she was going to be fearful of this particular defendant. She told you how the divorce and the relationship changed. She told you that she did all the work for him and he did not use it. In fact, he went to a third party to implement all of her work product, and she's actually afraid of this defendant.

(11 RT 1454–55). Petitioner's trial counsel, for his part, argued in closing that petitioner did not mean the things that he had said to others and that this was consistent with Dr. Stubblefield's testimony that as a result of having ADD, petitioner often made very passionate statements about things that he did not mean or intend to carry out. Defense counsel emphasized that Dr. Stubblefield had testified that "violent tendencies" were not part of petitioner's ADD diagnosis (12 RT 1499).

Petitioner has failed to show that the state court unreasonably applied the *Strickland* standard in denying petitioner's state habeas petition. As to the performance of petitioner's trial counsel, it was not unreasonable to find it constitutionally sufficient for counsel to have allowed the prosecutor to make the argument he made in closing without objection, because any such objection would very likely have been overruled by the trial court as a proper comment on the evidence.

24

United States District Court

For the Northern District of California

As explained above, the Scott testimony was admissible uncharged conduct evidence to prove petitioner's motive for soliciting his wife's murder. Therefore, it was not improper for the prosecutor to comment on such testimony in closing, especially given the defense argument that Dr. Stubblefield's testimony showed that "violent tendencies" were not part of petitioner's ADD diagnosis. By sponsoring Dr. Stubblefield's testimony, petitioner opened the door to the prosecutor's comments about petitioner's past violent behavior. The prosecutor's argument was fair comment on evidence that rebutted Dr. Stubblefield.

Petitioner's traverse argues in conclusory terms that this portion of the prosecutor's closing argument was a character propensity argument, and so his trial counsel was ineffective for failing to object. To the contrary, his trial counsel could have chosen to not object because such objection would have been overruled given that, although Scott's testimony had likely been offered to show petitioner's motive to solicit, it could properly be used to rebut Dr. Stubblefield's testimony after the defense case, to the extent Dr. Stubblefield's testimony tended to show petitioner was not prone to violent tendencies.

Again, "the failure to take a futile action can never be deficient performance." *Rupe*, 93 F.3d at 1445. Therefore, it was not unreasonable for the state court to have found it constitutionally sufficient for counsel to have made a tactical decision to not object to this portion of the prosecutor's closing argument. Moreover, it was not unreasonable for the state court to have found a lack of prejudice if trial counsel's performance was deficient. In addition to the reasons stated above, the prosecutor's comments were relatively brief, and the trial court properly instructed the jury. Petitioner has not shown the state court's decision to have been an unreasonable application of the *Strickland* standard based on trial counsel's failure to object to the prosecutor's argument in closing regarding Scott's testimony.

**E.   NO CLAIM BASED ON PROPENSITY EVIDENCE**

As his fourth claim, petitioner argues that he was denied due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments because the prosecutor was allowed to introduce "propensity for violence" evidence, including evidence of petitioner's drug use, his

United States District Court

For the Northern District of California

1    jokes about there being a mine shaft with Mrs. Guasch's name on it, and Ms. Scott's testimony

2    regarding the incident on January 19, 2006, at her office.

3         *First*, as reviewed above, Scott testified that on January 19, 2006, petitioner banged on

4    her office door while Scott and her employees hid from him.  *Second*, there was evidence

5    presented at trial that when petitioner became angry with Mrs. Guasch, he would tell her that

6    there was a "mine shaft with [her] name on it" (5 RT 226–27, 243–44; 6 RT 387).  *Third*, there

7    was evidence that petitioner used drugs (*see, e.g.*, 7 RT 424, 512).

8         Petitioner's argument that the admission of this evidence violated his right to due

9    process and a fair trial is barred by "an independent and adequate state procedural rule."

10   *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Petitioner raised this claim on appeal in state

11   court, and the California Court of Appeal held that:

12              Generally, the failure to raise a timely objection to errors in admitting
             evidence and instances of prosecutorial misconduct forfeits any such appellate
13              claims. ( *People v. Williams* (2008) 43 Cal.4th 584, 620, 75 Cal.Rptr.3d 691, 181
             P.3d 1035 [admission of evidence]; Evid.Code, § 353 [same]; *People v. Brown*
14              (2003) 31 Cal.4th 518, 553, 3 Cal.Rptr.3d 145, 73 P.3d 1137 [prosecutorial
             misconduct.)
15
                Here, defense counsel did not object to the admission of evidence or
16              alleged misconduct, and defendant implicitly acknowledges that he forfeited his
             claims by alternatively claiming that counsel rendered ineffective assistance in
17              failing to object.

18   *Guasch*, 2010 WL 1328636, at *11 (Exh. 6 at 18).  In other words, petitioner's claim was barred

19   by a state procedural rule that evidentiary objections are forfeited unless timely raised and

20   petitioner failed to timely raise his objection, but instead claimed that his counsel *rendered*

21   *ineffective assistance* by not objecting to the admission of such evidence.

22        "In all cases in which a state prisoner has defaulted his federal claims in state court

23   pursuant to an independent and adequate state procedural rule, federal habeas review of the

24   claims is barred unless the prisoner can demonstrate *cause for the default and actual prejudice*

25   *as a result of the alleged violation of federal law*, or demonstrate that failure to consider the

26   claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750 (emphasis

27   added); *see also Walker v. Martin*, 131 S.Ct. 1120, 1127 (2011).

28

United States District Court

For the Northern District of California

1   Petitioner has not demonstrated cause for the default and actual prejudice as a result of

2   an alleged violation of federal law, or demonstrated that failure to consider this claim will result

3   in a fundamental miscarriage of justice.  For the reasons stated above, petitioner has not

4   established ineffective assistance of counsel or any other basis for cause; nor did the

5   introduction of alleged propensity evidence cause the pervasive prejudice that petitioner asserts

6   in his traverse.  His claim of violation of his right to due process and a fair trial as a result of

7   admission of certain evidence is therefore barred from habeas review.

8   **F.     NO PROSECUTORIAL MISCONDUCT**

9   As his fifth claim, petitioner argues that his right to due process was impaired by

10   improper prosecution arguments concerning "propensity for violence" evidence.  Petitioner

11   contends that the prosecutor committed prejudicial misconduct in closing argument by

12   reviewing the testimony of Ms. Scott, which testimony was discussed above.

13   This claim is barred by "an independent and adequate state procedural rule."  *Coleman*,

14   501 U.S. at 750.  Petitioner raised this claim on appeal in state court, and the California Court of

15   Appeal held that:

16      Generally, the failure to raise a timely objection to errors in admitting
        evidence and instances of prosecutorial misconduct forfeits any such appellate
17      claims. ( *People v. Williams* (2008) 43 Cal.4th 584, 620, 75 Cal.Rptr.3d 691, 181
        P.3d 1035 [admission of evidence]; Evid.Code, § 353 [same]; *People v. Brown*
18      (2003) 31 Cal.4th 518, 553, 3 Cal.Rptr.3d 145, 73 P.3d 1137 [prosecutorial
        misconduct.)

19

20      Here, defense counsel did not object to the admission of evidence or
        alleged misconduct, and defendant implicitly acknowledges that he forfeited his
21      claims by alternatively claiming that counsel rendered ineffective assistance in
        failing to object.

22   *Guasch*, 2010 WL 1328636, at *11 (Exh. 6 at 18) (also rejecting additional counter-argument,

23   that a trial-court admonition could not have cured prejudicial defect, in a footnote).  In other

24   words, petitioner's claim was barred by a state procedural rule that misconduct objections are

25   forfeited unless timely raised and petitioner failed to timely raise his objection, but instead

26   claimed that his counsel *rendered ineffective assistance* by not objecting to the prosecutor's

27   argument.

28

United States District Court

For the Northern District of California

1   "In all cases in which a state prisoner has defaulted his federal claims in state court

2   pursuant to an independent and adequate state procedural rule, federal habeas review of the

3   claims is barred unless the prisoner can demonstrate *cause for the default and actual prejudice*

4   *as a result of the alleged violation of federal law*, or demonstrate that failure to consider the

5   claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (emphasis

6   added); *see also Walker*, 131 S.Ct. at 1127.

7   Petitioner has not demonstrated cause for the default and actual prejudice as a result of

8   an alleged violation of federal law, or demonstrated that failure to consider this claim will result

9   in a fundamental miscarriage of justice. For the reasons stated above, petitioner has not

10  established ineffective assistance of counsel or any other basis for cause; nor did the

11  prosecutor's comments in closing cause the pervasive prejudice that petitioner asserts in his

12  traverse. His claim of prosecutorial misconduct is therefore barred from habeas review.

### G.    NO CUMULATIVE ERRORS

14  As his sixth claim, petitioner argues that there were unconstitutional cumulative errors at

15  his state-court trial. "[I]n an unusual case, a deliberate and especially egregious error of the trial

16  type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the

17  integrity of the proceeding as to warrant the grant of habeas relief, even if it did not

18  substantially influence the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 638 n.9 (1993).

19  As discussed above, however, there were no errors. Relief is therefore not warranted based on a

20  claim of cumulative errors.

### H.    ADDITIONAL MOTIONS BY PETITIONER

22  After briefing was complete, petitioner moved for expansion of the record, for

23  discovery, and for an evidentiary hearing. By all three, petitioner attempts to expand the record

24  beyond that considered by the state court as to petitioner's *Brady* claim. In petitioner's motions

25  for discovery and for an evidentiary hearing (Dkt. Nos. 11–12), he seeks (i) the "request for

26  leniency" that petitioner claims exists concerning Mr. Pawlaczyk's case, (ii) all records

27  concerning Pawlaczyk's case, (iii) all records concerning communications concerning

28  Pawlaczyk's case, and (iv) depositions of petitioner's trial prosecutor, petitioner's sentencing

prosecutor, members of the Three Strike Committee who "participated in decisions regarding" Pawlaczyk's case, "and/or" the person at the District Attorney's Office "who is most knowledgeable about the plea agreement(s)" in Pawlaczyk's case.  As to petitioner's motion for expansion of the record (Dkt. Nos. 9–10), the material petitioner seeks to admit was already in the state record (Exhibit 7), and to that extent this motion is **DENIED AS MOOT**.

On the other hand, to the extent that petitioner seeks to add extraneous briefing to our record via his motion to expand the record, it is **DENIED**, and his motions for discovery and for an evidentiary hearing regarding his *Brady* claim are **DENIED**.  Petitioner is seeking relief under Section 2254(d), and not Section 2254(e)(2).  *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1242 (9th Cir. 2005) ("Petitioner does not argue that a new retroactive rule of constitutional law applies . . . [and p]etitioner was aware of the factual predicates for his claim during his state court proceedings.").  Federal habeas review under Section 2254(d) is "limited to the record that was before the state court that adjudicated the claim on the merits."  An evidentiary hearing is not warranted "when the state-court record 'precludes habeas relief' under the limitations of § 2254(d)."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398–99 (2011) (citation omitted).  As explained above, petitioner is not entitled to relief under Section 2254(d) based on the state court record, so binding law dictates that petitioner is not entitled to expand the record via any of his motions.

### CONCLUSION

The petition for a writ of habeas corpus is **DENIED**.  Judgment will be entered in favor of respondents and against petitioner.

Rule 11(a) of the Rules Governing Section 2254 Cases requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied.  Petitioner must make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  He has

**United States District Court**
For the Northern District of California

failed to do so.  Consequently, a certificate of appealability is denied.

The Clerk shall close the file.


**IT IS SO ORDERED.**

Dated:  June 22, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE